IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNNSYLVANIA


UNITED STATES OF AMERICA

    v.                    CRIMINAL NO. 04-2 ERIE

KELLY ELIZABETH MUNNINGS


EVIDENTIARY HEARING ON DEFENDANT'S 2255 MOTION


Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Tuesday, December 5, 2006.


APPEARANCES:
         MARSHALL J. PICCININI, Assistant United States
         Attorney, appearing on behalf of the Government.

         ADAM B. COGAN, Esquire, appearing on behalf of

the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1               I N D E X

2      WITNESSES:           DIRECT  CROSS  REDIRECT  RECROSS

3   FOR THE PETITIONER:

4   Stephen Misko          6     17    28      33

5   Kelly Elizabeth Munnings     38    55    62      --

6                - - -

7      EXHIBITS:              IDENTIFIED    ADMITTED

8   Defendant's Exhibit A          8        9

9   Defendant's Exhibit B          8        9

10  Defendant's Exhibit C          42       43

11  Defendant's Exhibit D          11       13

12  Defendant's Exhibit E          48       49

13  Defendant's Exhibit F          51       51

14   Defendant's Exhibit G              12          13

15   Defendant's Exhibit H              13          13

16

17

18   Government's Exhibit 1             17          28

19   Government's Exhibit 2             25          28

20   Government's Exhibit 3             35          64

21   Government's Exhibit 4             59          64

22

23

24

25                          - - -



                                    3


1               P R O C E E D I N G S

2

3               (Whereupon, the proceedings began at 3:30 p.m., on

4    Tuesday, December 5, 2006, in Courtroom C.)

5

6               THE COURT:  This is the time we set for an

7    evidentiary hearing on the defendant's motion to vacate

8  judgment pursuant to 18 U.S.C. Section 2255.  And before we get

9  started, Mr. Cogan, it might be helpful for you, as counsel, to

10  frame the issue or issues that you think are going to be

11  driving the hearing today?

12       MR. COGAN:  Your Honor, I think the best way I can

13  assess that, address the court on that matter, is that our

14  position is that the defendant wanted to perfect an appeal.

15  There seems to be right now a little bit of dispute as to what

16  exactly the advice, what the consultation that is required

17  under the precedent by the United States Supreme Court and the

18  recent Third Circuit court case, which I know the court was

19  aware of at the last hearing, the Hines hearing in this matter.

20  With all candor to the court, I think we're going to need to

21  have some testimony just to flush it out a little bit here.

22       THE COURT:  And we'll do that, we'll see where the

23  evidence leads.  But before we get into the hearing, what is

24  your client's -- let me put it this way.  I had been working

25  under the impression that this was largely, if not exclusively,

4

1  a United_States_v._Solis issue.  That being your client

   _____ _____ __ _____

2  contends that she directed her previous counsel to perfect an

3  appeal from my resentence of August 2, 2005.  Is that a

4  component of my factual analysis here today?

5      MR. COGAN:  Your Honor, it is, but it is not as

6  simple as that.  Because her discussions with her counsel

7  regarding the appeal cannot be looked at in isolation, simply

8  with respect to the resentencing, but have to go back

9  throughout the discussions that she had with him regarding the

10  gun enhancement, your Honor.  There was also -- I think this is

11  an issue, I apologize to the court but some of this just is

12  coming to light, I have no other way to address it other than

13  how I am.  There is a discrepancy as to the consultation that

14  she was given with respect to the enhancement.  Indeed, from

15  what I am able to gather, from my previous discussions just a

16  few moments ago with Mr. Misko, he advised her that the gun

17  enhancement did not apply.  And that was in fact not the case.

18  The court, as I read the amended judgment, applied the gun

19  enhancement.  So part of her understanding about what she could

20  have appealed was colored by that representation.

21      THE COURT:  I don't understand that, the gun

22  enhancement didn't apply.  But if I applied it at the second

23  sentencing, just like I did at the first, correct, then why

24  wouldn't my mistake, if indeed it was one, be fertile field for

25  an appeal?


5


1       MR. COGAN:  Then that's our position, that it was,

2  your Honor.  But there was some misunderstanding.  Mr. Misko

3  did not understand your resentencing order to be an advocation

4  of the gun enhancement.  That colored my client's understanding

5  of her --

6       THE COURT:  What do you have to say about this,

7  before we get started here with some testimony?

8       MR. PICCININI:  Some of that I don't know as a

9  factual issue.  But as far as how I think the issue is framed

10  today, it's whether -- just as it was with Mr. Hines, did

11  counsel consult.  If he did not consult, then is this a

12  situation where a rational defendant would have wanted to

13  appeal, or whether this specific defendant reasonably

14  demonstrated a desire to appeal.  I initially believed the way

15  we responded to her papers is that she asked counsel to appeal

16  and he just didn't do it.

17          THE COURT:  In which case prejudice is presumed?

18          MR. PICCININI:  Right.

19          THE COURT:  If I find the request was made.

20          MR. PICCININI:  I get the sense the factual issue is

21  muddier, that this may be one where the court has to determine

22  whether there was meaningful consultation.  Or if there was

23  not, whether this defendant, who was in a situation where no

24  reasonable defendant would want to appeal, or she didn't make

25  her desire to appeal known clearly to counsel.


6


1          THE COURT:  What's the Supreme Court case again?

2          MR. PICCININI:  Flores-Oretga.
                        _____

3          THE COURT:  What's the cite on that?

4          MR. COGAN:  528 U.S., I believe 478, your Honor.

5          THE COURT:  When was that case decided?

6          MR. COGAN:  Unfortunately, I'm looking at the Third

7  Circuit case that discusses Flores.
                        _____

8          THE COURT:  Is that a brand new case?

9          MR. PICCININI:  Harrington was brand new around the
                        _____

10  time of the filing of these petitions in July of this year.

11      MR. COGAN:  Flores-Ortega is 528 U.S. 470, Supreme
        ───────────────

12  Court case of 2004, your Honor.  And the Third Circuit case is

13  Harrington_v._Gillis, 456 F.3d 118.
    ─────────── ── ──────

14      THE COURT:  All right.  Are we going to have some

15  testimony here?

16      MR. COGAN:  Yes, your Honor.  To expedite matters, I

17  kind of juggled my order a little bit, I'm going to call Mr.

18  Misko so that he will be able to leave with the inclement

19  weather.  I apologize, some of my exhibits will seem a little

20  bit out of order in their lettering, but I think we can work

21  through it, your Honor.

22      THE COURT:  All right, call Mr. Misko.

23      MR. COGAN:  Thank you, your Honor.

24      STEPHEN MISKO, PETITIONER WITNESS, SWORN

25          DIRECT EXAMINATION


7


1  BY MR. COGAN:

2  Q.  Mr. Misko, you were counsel of record for Kelly Munnings

3    in the case of United States versus Kelly Munnings at Criminal

4    No. 04-2 Erie?

5    A.    Yes, sir.

6    Q.    And you represented her pretty much from beginning to end

7    in connection with this case, is that correct?

8    A.    Yes, sir.

9    Q.    When you first came to represent Ms. Munnings, you had

10    discussions with her regarding a plea of guilty and what

11    sentence she would likely receive, is that correct?

12    A.    Yes, sir.

13    Q.    Did you discuss with her initially the likelihood that a

14    gun enhancement would be applied by Judge McLaughlin for the

15    sentencing process in this case?

16    A.    I believe the first time that came to light is when the

17    PSI was filed with the court.

18    Q.    Okay.  So it was the defendant had pled guilty, the PSI

19    was prepared, and you spoke with Ms. Munnings regarding the

20    conclusions drawn in the presentence report, is that correct?

21    A.    Yes, in reference to whether we should file objections or

22    not.

23    Q.    And in fact you did file objections, did you not, to the

24  presentence report?

25  A.   Yes.


8


1        MR. COGAN:  Your Honor, may I approach the witness?

2        THE COURT:  Yes.

3  BY MR. COGAN:

4  Q.   I'm going to hand the witness what has previously been

5  marked as Defendant's Exhibit A.  Is that a copy of the

6  original objections you filed in this case?

7  A.   They appear to be.

8  Q.   And in those objections, really the only issue you

9  contested was the two-point gun enhancement, is that correct?

10  A.   Yes.

11  Q.   And that two-point gun enhancement took the defendant

12  from a sentencing range of or an offense gravity score,

13  ultimate gravity score of 29 to 31; and a sentencing range of

14  108 to 135, to 135 to 168, is that correct?

15  A.   Yes, sir.

16  Q.   An, indeed, you also filed supplemental objections to the

17  presentence report, is that correct?

18  A.   Yes.

19  Q.   I'm going to hand you what has been marked as Defendant's

20  Exhibit B.  Is this in fact a copy of the supplemental

21  objections that you filed?

22  A.   Yes.

23  Q.   And in those supplemental objections, you reiterated, in

24  addition to a generalized Blakely objection, the gun
                          ―――――――

25  enhancement issue as an objection, is that correct?


                              9


1  A.   Yes, sir.

2       MR. COGAN:  Your Honor, I move for the admission of

3  those exhibits.

4       THE COURT:  They're admitted.

5  BY MR. COGAN:

6  Q.   Did you have discussions then with your client regarding

7  the likelihood of what was going to happen before Judge

8  McLaughlin with respect to, particularly to the gun

9  enhancement?

10      THE COURT:  Excuse me, are you talking about prior

11  to the first sentencing?

12          MR. COGAN:  Yes, your Honor.

13   BY MR. COGAN:

14   Q.    Prior to the first sentencing, did you have discussions

15   with Ms. Munnings about what Judge McLaughlin was likely going

16   to do with respect to that issue?

17   A.    We had discussions in reference to the difference between

18   if the judge concurred with the two-level increase and if he

19   did not.

20   Q.    Okay.  And I take it that you advised Ms. Munnings that

21   you anticipated that the judge would likely apply the gun

22   enhancement?

23   A.    I did not reach that conclusion, I didn't know what the

24   judge was going to do.

25   Q.    Well, you considered it a possibility, did you not?


                              10


1   A.    Yes.

2   Q.    And you discussed with Ms. Munnings what would happen if

3   in fact it applies, isn't that correct?

4   A.    Yes, it would be a level 31 versus a level 29.

5   Q.    And it was decided early on, even before the sentence,

6   that if the judge applied the gun enhancement, that you would

7   perfect an appeal on Ms. Munnings' behalf, is that correct?

8   A.   I don't know if we specifically talked about it at that

9   time or not, I think we were waiting to see what the court was

10   going to do and then reassess.

11   Q.   Is it fair to say that Ms. Munnings was fairly adamant

12   that she did not believe that a gun enhancement should apply to

13   her?

14   A.   Well, it was a mutual decision that we felt that based

15   upon the fact that she pled only to controlled substances and

16   not to possession of any firearms, that we believed that it

17   would be inappropriate to increase the punishment based on a

18   2D1.1 --

19   Q.   And, indeed, in your supplemental objections you stated

20   at paragraph 31, I'm sorry -- I apologize, your Honor.  In your

21   original objections, you pointed that fact to the court, that

22   it was basically a 10-year case, that was your understanding

23   and Ms. Munnings' understanding of the plea agreement, is that

24   correct?

25   A.   Yes.

1  Q.   Now, at sentencing, the original sentencing, the judge

2  found the enhancement, is that correct?

3  A.   Yes.

4  Q.   And had sentenced Ms. Munnings to 140 months, is that

5  correct?

6  A.   Yes.

7  Q.   And you filed a notice of appeal, essentially, to contest

8  that two-point gun enhancement, is that correct; is that fair

9  to say?

10  A.   Yes, sir.

11  Q.   Okay.  And, indeed, you filed -- after filing the notice

12  of appeal, you filed with the Court of Appeals a motion for

13  summary remand, did you not, sir?

14  A.   Yes.

15  Q.   I'm going to hand you what's been marked as Defendant's

16  Exhibit D; is that a copy of the motion for summary remand that

17  you filed with the Third Circuit?

18  A.   Yes.

19  Q.   Okay.  And in that motion for summary remand at paragraph

20  seven, you specifically indicated that you thought that

21  two-level gun enhancement was an error, is that correct?

22  A.   Yes.

23  Q.   The government, through an assistant United States

24  Attorney in Pittsburgh, filed a response to your precise motion

25  for remand, isn't that correct?


                                    12


1  A.   I believe so.

2  Q.   And they did it in letter form, isn't that correct; do

3  you recall?

4  A.   Yes, I believe so.

5  Q.   I'm going to hand you what has been marked as Defendant's

6  Exhibit G, it's a letter to the Clerk of the Third Circuit,

7  dated April 12, 2005, signed by Michael Ivory of the United

8  States Attorney's Office; do you recall receiving that

9  document?

10  A.   Yes.

11  Q.   And, essentially, on page two of that document, at

12  paragraph five, the government essentially argues that the only

13  issue that you could raise on appeal is the gun enhancement and

14  no Booker challenge was even appropriate at this stage, is that

                    _____

15  correct?

16  A.   That's what it appears to say.

17  Q.   So, in essence, your appeal was the gun enhancement, is

18  that right?

19  A.   Yes.

20       THE COURT:  Let me ask a question, I'll see the

21  document.  Was the basis for the petition for summary remand,

22  was that based upon the implications of Booker?

                    _____

23       THE WITNESS:  Yes, your Honor.

24       MR. COGAN:  I'm going to get to that, your Honor.

25  The next exhibit I was going to admit, which I've marked as


                              13


1  Defendant's Exhibit H, is a copy of the order remanding the

2  case, your Honor.

3       THE COURT:  All right.

4       MR. COGAN:  Perhaps just to expedite matters, I

5  would move for the admission of these three exhibits.

6       THE COURT:  They're admitted.

7  BY MR. COGAN:

8   Q.    And in reviewing Defendant's Exhibit H, which was the

9   order remanding the case, it was not in fact a finding that the

10  gun enhancement should not apply, simply a generalized Booker

———

11  remand that brought the case back before Judge McLaughlin, is

12  that correct?

13  A.    Yes, sir.

14  Q.    Now, when the case came back before Judge McLaughlin for

15  resentencing, did you meet with Ms. Munnings prior to the

16  resentencing hearing?

17  A.    I don't have any specific recollection of where we met

18  prior to, whether it was in court or up in a holding cell in

19  the Marshal's office.

20  Q.    Okay.  It was definitely not at the Erie County Jail, is

21  that correct?

22  A.    I don't have any recollection where it was.

23  Q.    And it wasn't at any other county jail, is that correct?

24  A.    If I had not met her at the Erie County Jail, it would

25  have been here at the U.S. Courthouse.


14


1   Q.    Okay.  I take it that was simply a brief discussion about

2   what was going to happen at resentencing?

3   A.   Yes.

4   Q.   Now, in connection with the resentencing, we spoke out in

5   the hall regarding this matter, is it correct that it was your

6   understanding that the judge did not impose the gun enhancement

7   in resentencing Ms. Munnings?

8   A.   Upon consideration, I don't have any specific

9   recollection, I didn't read the sentence transcript.  So when

10  we appeared for resentencing on August 4th of 2005, I don't

11  have a specific recollection of what the court announced.

12  Q.   Okay.  Well, do you have any specific recollection of

13  your conversations with Ms. Munnings concerning the

14  resentencing?

15  A.   I recall after the court -- strike that.  My recollection

16  is that prior to sentencing, we had determined that the

17  guideline range was 108 to 135 months.  That Ms. Munnings was

18  subject to a 10-year mandatory under 841(b)(1)(a).  Therefore,

19  the guidelines, in light of that, would have been 120 to 135.

20  It was my best educated guess that the court was going to

21  sentence her at the high end of the guideline range.

22  Q.   And at a range of 108 to 135 months, that would be a

23  non-gun enhancement range, isn't that correct, Mr. Misko?

24  A.   Yes.

25  Q.   Okay.  And the discussions that you had with Ms. Munnings


15


1  were consistent with your testimony in court that she would be

2  sentenced at a non guideline range?

3  A.   She would have been sentenced --

4  Q.   Excuse me, a non-gun range, I apologize?

5  A.   She would have been sentenced without the benefit of a

6  2D1.1 upward departure.

7  Q.   Now, did you meet with Ms. Munnings after sentencing?

8  A.   We had met in the courtroom after sentencing.

9  Q.   Okay.  Did you have any discussions with her regarding

10  the sentence that the judge imposed that were inconsistent with

11  your earlier discussions, that the gun enhancement would not

12  apply?

13  A.   My recollection is is that the sentence was consistent

14  with what I believed it was going to be based upon a level 29.

15  Q.   And that was a non-gun enhancement range, is that

16  correct, sir?

17  A.   That's correct.  I don't have any specific recollection

18  about talking with her in reference to the court indicating

19  that a gun enhancement was applicable.

20  Q.   I simply have one final area of inquiry for you, sir.

21  Do you recall, in connection with the original sentencing and

22  with the resentencing, that the judge recommended that Ms.

23  Munnings participate in the Bureau of Prisons' drug treatment

24  program?

25  A.    I have recollection that that is what the court ordered.


16


1  And upon review of the amended sentence order, I believe that

2  is contained, the intensive drug treatment program.

3  Q.   Okay.  And you're aware, are you not, sir, that if a gun

4  enhancement would apply, then a defendant would not be eligible

5  for participation in that program pursuant to Bureau of

6  Prisons' policy?

7  A.   That was a consideration, yes.

8  Q.   So that would have been an additional factor that you

9  would have discussed with Ms. Munnings if in fact you thought

10  the gun enhancement applied in resentencing, but you didn't

11  have any discussions with Ms. Munnings regarding that because

12  you didn't think the gun enhancement was applied by the court?

13  A.    That's not correct.  I said I don't have specific

14  recollection of that issue.  It may have been discussed, but I

15  don't have specific recollection of that issue.

16  Q.    Okay.  So you don't have any recollection one way or the

17  other discussing anything regarding the drug policy the Bureau

18  of Prisons has for earning time off your sentence with Ms.

19  Munnings, is that fair to say?

20  A.    She had requested a willingness to enter the program and

21  the court obliged her by entering that as part of the order.

22      MR. COGAN:  Very well.  I think that's all I have,

23  your Honor, can I just have a moment real quickly with my

24  client?

25      THE COURT:  All right.


                                17


1       MR. COGAN:  That's all the questions I have on

2  direct examination.

3       THE COURT:  All right.  Mr. Piccinini.

4            CROSS-EXAMINATION

5    BY MR. PICCININI:

6    Q.   Mr. Misko, you've indicated that with regard to your

7    present recollection concerning your discussions with Ms.

8    Munnings prior to the resentencing, your current recollection

9    is somewhat vague with regard to those discussions prior to the

10   resentencing?

11   A.   Yes.

12   Q.   I'm going to show you what I'm going to mark as

13   Government Exhibit 1 for identification, which purports to be

14   the transcript from the resentencing in this case.  And you've

15   testified so far, in all fairness to you, based upon an

16   uncertainty with regard to your recollection of these issues.

17   Your belief about the guidelines being 108 to 135 months, not

18   to a higher level that would have applied the sentencing

19   enhancement, the 135 to 168; which was applied in the first

20   sentencing, is that correct?

21   A.   Yes.

22   Q.   As I show you Government Exhibit 1, I'm just going to

23   have you go through a variety of pages of the document --

24          THE COURT:  Has that been marked?

25          MR. PICCININI:  It has been marked as Government

1  Exhibit 1.

2      THE COURT:  Are there certain portions that you want

3  him specifically to read.

4      MR. PICCININI:  I've marked the entire transcript,

5  in fairness to counsel, I know the day is getting long, it's

6  only 11 pages.  If I can have counsel look at it, so that I can

7  go back to those pages.  Because there are multiple references

8  to the guideline range being 135 to 168.

9      THE COURT:  Is this the rehearing transcript?

10     MR. PICCININI:  This is the resentencing transcript,

11  this is dated August 2, 2005.

12     THE COURT:  All right, let's do this.  So Mr. Misko

13  doesn't feel like he has a judge breathing down his neck.  I'll

14  get off the bench for a few minutes, you take your time and

15  read it, when you're ready, I'll come back out.

16     MR. PICCININI:  Thank you, your Honor.

17     (Recess from 3:53 p.m.; until 4:00 p.m.)

18     THE COURT:  All right, Mr. Piccinini.

19  BY MR. PICCININI:

20  Q.   Now, Mr. Misko, in preparation for today, counsel

21  indicated that he met with you in the hallway in preparation

22  for your direct examination.  Have you ever had the opportunity

23  or were you presented at all a transcript of the resentencing

24  proceedings prior to your testimony on direct examination?

25  A.   No.


                                    19


1  Q.   Having done so today and having read through Government

2  Exhibit 1, has that refreshed your recollection with regard to

3  the incidents surrounding the resentencing in this case?

4  A.   Yes, it does.

5  Q.   Is there anything about your testimony on direct that

6  you'd like to correct with regard to your current present

7  recollection as to the events leading up to that resentencing?

8  A.   Prior to resentencing, Ms. Munnings and I had still

9  discussed that we believed the appropriate guideline sentence

10  was based on a level 29, which would be 108 to 135 months.

11  After resentencing, where the court deemed that the 2D1.1

12  enhancement was appropriate, we discussed the guideline issue

13  of 135 months, which would have been the bottom range of a

14  level 31 and the top of a level 29.  We also had discussions in

15  reference, after resentencing, that if an appeal would be filed

16  and the Third Circuit deemed that the enhancement was not

17  applicable or given in error, that the case, if remanded back

18  to the U.S. District Court, the judge could still give the same

19  sentence because it was a sentence appropriate under a level

20  29.

21  Q.    Now, when we go back to the point in time where you filed

22  the original notice of appeal and your original objections

23  prior to the first sentencing, would you agree with me that the

24  issue about the weapons enhancement was a combination of two

25  things.  The first being a factual dispute as to whether


                              20


1  factually the gun enhancement should apply to her, but just as

2  significant a legal argument under Blakely, as to whether the
                        _____

3  government should have proven to a jury or a judge beyond a

4  reasonable doubt, any factual matter that arose or that gave

5  rise to a guideline enhancement?

6  A.    It was those two issues, in addition to the enhanced time

7  under a level 31 versus a 29.

8   Q.   And just as a practical matter, obviously, the defendant

9   having been sentenced, doesn't want to get sentenced to a

10   higher level?

11   A.   Correct.

12   Q.   So you do what you can to get the level down, make a

13   factual argument concerning the guns and make a legal argument

14   under what was at the time Blakely?

_____

15   A.   That's correct.

16   Q.   In the motion for summary remand that you filed in the

17   Third Circuit, would you agree with me that the basis for the

18   filing of the motion for summary remand was a new pronouncement

19   by the Supreme Court in Booker?

_____

20   A.   That's correct.

21   Q.   And that based upon the Booker principles, which really

_____

22   were a culmination of what had been going on for years as

23   arguments under Apprendi and Blakely, the case should be

_____     _____

24   remanded for the court to use the advisory guidelines?

25   A.   Correct.

21

1  Q.   So the focus of getting it back is there was now a new

2  landscape for sentencing judges, we didn't have to worry about

3  arguing Blakely on resentencing, would you agree?

   _____

4  A.   Yes.

5  Q.   That the issue whether to argue to anybody, that the

6  government had to prove beyond a reasonable doubt the guideline

7  enhancement, that was no longer part of the legal landscape?

8  A.   Yes.

9  Q.   Now, when we get to the point of sentencing, you

10  testified that you recall having specific conversations with

11  your client about the 135 to 168 month guideline, is that

12  correct?

13  A.   Yes.

14  Q.   And, specifically, you recall having consultation with

15  your client that without the firearm enhancement, the

16  sentencing guideline would have been 108 to 135?

17  A.   Correct.

18  Q.   With the gun enhancement, the guideline would have been

19  135 to 168?

20  A.   Correct.

21  Q.    Did you specifically recall discussing with her what

22  would happen if a 135-month sentence would occur; that being

23  how that would impact things -- that's a bad question, let me

24  rephrase the question.  Do you specifically recall discussing

25  with her the fact that --


                                22


1         THE COURT:  At what point in time are we now?

2         MR. PICCININI:  This is prior to resentencing.

3  BY MR. PICCININI:

4  Q.    Prior to her being in court for the post-Booker
                                              _____

5  resentencing.  That in looking at the guidelines, you advised

6  your client that if you got a 135-month sentence, that would

7  pose a particular difficulty for her because she could get the

8  135-month sentence whether the judge applied the enhancement or

9  not?

10  A.    Correct.

11  Q.    And do you specifically recall discussing with her the

12  fact that if she were to appeal and go to the Third Circuit --

13        THE COURT:  Are we presentence or post sentencing?

14        MR. PICCININI:  This is now post resentencing.

15  BY MR. PICCININI:

16  Q.    She goes to the resentencing and she receives a reduced

17  sentence of 135 months.  Okay.  Do you recall having a

18  discussion with her about the ramifications of an appeal if she

19  is sentenced to 135 months, and how you would no longer have

20  that good of an argument because the 135 months fell in both

21  guidelines, this would have been prior to her being

22  resentenced?

23  A.    We had that discussion prior to being resentenced.  And

24  after the court resentenced her, we also had that discussion.

25  Q.    Now, after the court resentenced her to a reduced

23

1  sentence, from 140 to 135 months, can you indicate to Judge

2  McLaughlin what the nature of your conversation was with Ms.

3  Munnings as to an appeal, and specifically as to the 135-month

4  issue?

5  A.    After Ms. Munnings was sentenced --

6        THE COURT:  Resentenced.

7        THE WITNESS:  I'm sorry, resentenced, the discussion

8  was in reference to the fact that the 135 months was within the

9   guideline range of a level 29.  At that time we had no further

10  discussion in reference to whether an appeal was appropriate.

11  In fact, Ms. Munnings at that time seemed to be satisfied with

12  the sentence that the court had given and had made no reference

13  to appealing the sentence of 135 months.

14  BY MR. PICCININI:

15  Q.    Okay.  In light of your resentencing discussions and your

16  discussions with her after the sentence, where her sentence was

17  reduced from 140 months to 135 months, in that discussion after

18  the resentencing, were you satisfied that your client was

19  satisfied with this reduced sentence?

20  A.    Yes.

21  Q.    Do you recall her making any statements about her desire

22  to just get on with her life and serve her sentence?

23  A.    She said something to the effect of moving on.  I know

24  she had other cases in Crawford County that I did not represent

25  her on, but she was anxious to move on.  Our discussion


24


1   probably lasted five minutes or less in the courtroom.  And

2   that's the last time I've ever seen her until today.

3  Q.   So your post-resentencing discussion occurred here in the

4  courtroom?

5  A.   Yes.

6  Q.   Before she was taken off by the Marshals?

7  A.   Yes.

8  Q.   Your pre-resentencing discussion about the appeal would

9  not have occurred just prior to the resentencing?

10  A.   I think it occurred up in the Marshal's bullpen.

11  Q.   And rather than me go back to the portions of the

12  transcript where the court talks about the 135 to 168, you have

13  refreshed your recollection sufficiently and you are not

14  indicating to the court that you or your client believed that

15  the weapons enhancement did not apply?

16  A.   No.  Based upon a reading of that transcript, it was

17  clear that the court applied the weapons enhancement, and also

18  reiterated the fact that a level 31 was appropriate, the

19  guideline range of 135 to 168 months.  The only change being

20  from the original sentencing was the fact that the amended

21  sentence was 135 months versus 140 months.

22  Q.   Now, counsel also asked you about concerns that you and

23  the defendant had concerning the intensive drug treatment

24  program?

25  A.   Yes.


25


1  Q.   I'm going to show you what I've marked as Government

2  Exhibit 2 for identification, which is just the amended

3  judgment in this case.  If you can take a look at Government

4  Exhibit 2, the amended judgment that stemmed from the August 4,

5  2005 resentencing, did the court make a specific order with

6  regard to his recommendation concerning the intensive drug

7  treatment program?

8  A.   Yes, the third paragraph recommends the defendant receive

9  intensive drug treatment.

10  Q.   Okay.  At any point in time after the resentencing or

11  within 10 days of that resentencing, did your client ever call

12  you or contact you or in any way directly ask you to file an

13  appeal on her behalf?

14  A.   No.

15  Q.   After the resentencing, do you recall receiving, first of

16  all, any written correspondence at any time from this

17  defendant?

18    A.    Not after the resentencing.

19    Q.    Do you recall receiving any phone calls from this

20    defendant after the resentencing?

21    A.    No.

22    Q.    Do you recall receiving any solicitation from members of

23    her family after the resentencing?

24    A.    No.

25    Q.    At any point in time, did the defendant relay a concern

26

1    that with the weapons enhancement, she couldn't benefit from

2    the judge's recommendation for the intensive drug treatment

3    program?

4    A.    No.

5    Q.    Now, Attorney Misko, in light of your discussions with

6    your client, both before the resentencing, after the

7    resentencing and really throughout the course of your

8    representation of her, did it appear to you that this defendant

9    desired for you to file an appeal on her behalf after the

10    resentencing?

11    A.    No.

12  Q.    At any point in time, did she in any way demonstrate to

13  you, after the resentencing or even before resentencing in the

14  context of the post remand timeframe, did she ever reasonably

15  demonstrate to you a desire to appeal?

16  A.    No.

17  Q.    Now, as opposed to that post remand and resentencing

18  timeframe, during the timeframe of her first sentencing, did it

19  appear to you, did she reasonably demonstrate to you a desire

20  to appeal?

21  A.    I'm sorry, could you repeat the question.

22  Q.    As opposed to what happened with regard to the

23  resentencing, with regard to the first sentencing, was it clear

24  to you that she wanted an appeal?

25  A.    After the first sentencing, yes.


27


1  Q.    And you and she had discussed the sentencing and the

2  issues that would be raised on appeal?

3  A.    Yes.

4  Q.    And it was clear to you that it was your desire as her

5  counsel and her desire as your client, that an appeal should be

6   filed the first time around?

7   A.   She requested an appeal be filed and I filed it.

8   Q.   That did not occur in the context of the resentencing?

9   A.   No, it did not.  If Ms. Munnings had requested that I

10  appeal after the judgment on resentencing, I would have filed

11  an appeal.

12  Q.   And did you leave this courtroom, in light of your

13  conversations with her right before the resentencing and after

14  the resentencing, satisfied that you achieved for your client a

15  five-month reduction in the sentence from its original

16  sentencing amount and that she did not desire for an appeal to

17  be filed?

18  A.   She made no request to file an appeal.

19  Q.   With regard to the impact of the 135-month sentence, as

20  opposed to 136 or 137 or anything above 135 months, did the

21  fact that a 135-month sentence fall within the guideline with

22  the weapons enhancement and also the guideline without the

23  weapons enhancement, impact the discussion with your client and

24  your own decision not to file an appeal?

25  A.   The 135 months was within the guidelines of a level 29

28

1  sentence, that had been discussed.  Because that had been

2  discussed and achieved at the resentencing, there was no issue

3  of filing an appeal.

4  Q.    And is that because it didn't really matter because with

5  or without the weapons enhancement, the 135 months was within

6  the range?

7  A.    Yes.

8        THE COURT:  Did you have an objection?

9        MR. COGAN:  No, I thought he was finished, your

10  Honor, I apologize.

11        THE COURT:  He's winding down.  Go ahead.

12        MR. PICCININI:  Your Honor, I would request the

13  admission into evidence of Government Exhibits 1 and 2.

14        THE COURT:  They're admitted.

15        MR. PICCININI:  That's all I have.

16                REDIRECT EXAMINATION

17  BY MR. COGAN:

18  Q.    Mr. Misko, you discussed with the court Ms. Munnings'

19  original intentions to appeal, correct?

20  A.    I'm sorry.

21  Q.    You just testified regarding Ms. Munnings' original

22  intention to appeal her conviction, the original judgment of

23  sentence, correct?

24  A.    Yes.

25  Q.    Okay.  The original judgment of sentence, that appeal was

29

1  based upon contesting the gun enhancement, are we in agreement

2  there?

3  A.    It was the possession of the firearm, in addition to the

4  increased time, which was under 2D1.1.

5  Q.    And you represented to the court that the District Court

6  was wrong in your concise motion for remand, arguing that the

7  two-point enhancement should not have applied, correct?

8  A.    Correct.

9  Q.    Now, you testified regarding your discussions with Ms.

10  Munnings after resentencing, is that correct?

11  A.    Yes.

12  Q.    Is it fair to say, sir, that you never explained to Ms.

13  Munnings that she could appeal that sentence that was imposed

14  by the court?

15  A.    Well, we had discussions before resentencing and after

16   resentencing about what we were attempting to achieve.  And

17   what we were attempting to achieve was a guideline sentence

18   within 108 to 135 months.

19   Q.    But my question is, sir, did you advise Ms. Munnings that

20   she could have appealed the sentence that was imposed at 135

21   months, and continued to challenge the gun enhancement with the

22   prospective that if she prevailed, the judge might change his

23   mind and sentence her instead of 135 months at the top of the

24   non-gun range, to a lower sentence within the non-gun range or

25   at the bottom of the non-gun range, is that correct?


30


1  A.    You mean between 120 and 135 months?

2  Q.    Yes.

3  A.    We had some discussion prior to resentencing about what

4  we anticipated that the court may do.  But the discussion,

5  again, was based upon the increased amount of time if the court

6  had rendered the two-point upward departure.

7  Q.    So, to clarify, and I'm only talking about the

8  post-resentencing discussions.  You never advised Ms. Munnings

9  that she could continue to persist in challenging the gun

10  enhancement, and that if successful, it might result in a lower

11  sentence than 135 months, is that fair to say?

12  A.    Well, I don't know if that's fair to say, we had sat down

13  and we had discussed, I don't have any specific recollection of

14  the exact words I used.  But we had discussed the sentence that

15  was given by the court.  And she at that point seemed to be

16  satisfied with the sentence that was rendered because it was

17  within the level 29 range.

18  Q.    But getting to the advice that you gave her with respect

19  to the appeal, did you advise her, with respect to an appeal,

20  that she could continue to persist the application of the gun

21  enhancement or don't you simply recall?

22  A.    I don't have any specific recollection of that, of

23  continuing to appeal.  We had talked about whether the

24  sentence, the resentence was satisfactory based upon all the

25  issues that had been brought up previously.  And she seemed to


31


1  be satisfied with the sentence.

2  Q.    And you have no recollection of specifically advising Ms.

3  Munnings with regard to her placement in the drug program and

4  how she might be -- she would forfeit or not be able to receive

5  a reduction in her sentence because the gun enhancement

6  applied, is that correct?

7  A.   I don't have any recollection of that.

8  Q.   Okay.  And you also didn't advise Ms. Munnings that she

9  could appeal basically just claiming that the judge's sentence

10  was unreasonable, is that correct; an unreasonable application

11  of the Rule 3553 factors?

12  A.   This just did not occur in a time capsule.  We had time

13  before resentencing, much more time, a lot of discussions with

14  my client about sentencing issues.  All these issues had come

15  up over the course of at least a year.  So Ms. Munnings was

16  fully aware of the implications of the sentencing and

17  resentencing.

18  Q.   Are you sure about that, sir?

19  A.   To the best of my recollection, I advised my client to

20  that.

21  Q.   In reviewing the resentencing transcript, do you see that

22  you continued to argue the gun enhancement after the judge had

23  made the findings that the gun enhancement applied?

24  A.   Well, like most defense attorneys, we're pretty insistent

25  upon what our positions are, sometimes the court, most of the

32

1  time the court doesn't believe them, but as a good attorney I

2  keep trying to -- trying to tell the court that, especially

3  when you're arguing for a sentence of 120 months.

4  Q.    But the fact of the matter remains, sir, does it not,

5  that the original appeal you filed on behalf of Ms. Munnings

6  was essentially a challenge to the gun enhancement, and that

7  gun enhancement was again imposed upon resentencing and that no

8  appeal was then taken and that you have no recollection of

9  specifically advising Ms. Munnings that she could continue to

10  appeal that gun enhancement because the Third Circuit never

11  reached that issue, isn't that correct, sir?

12  A.    The Third Circuit in its remand gave great latitude for

13  the U.S. District Court in resentencing.  It didn't remand on a

14  specific issue, it remanded because it determined that the U.S.

15  District Court was the best entity to indicate what the

16  sentence would be.

17  Q.    It never reached the gun enhancement, did it, sir?

18  A.    I don't believe it did.  It, basically, the Booker

_____

19  decision, as counsel knows, essentially established that the

20  guidelines were unconstitutional and made them advisory.

21  Q.    You never had an opportunity to brief the gun enhancement

22  and it was never submitted for oral argument.  It was simply

23  that the court remanded for resentencing, we're wiping the

24  slate clean, let's start over because of Booker.  Not because
                              ———————

25  of a ruling on the legitimacy or lack thereof of the gun


                                33


1  enhancement, isn't that correct?

2  A.    The Third Circuit was the body that told me what to file,

3  I was intending to file a brief, the Third Circuit directed

4  that I file a motion for summary remand.

5  Q.    Right.  And, again, there was no ruling on the merits

6  regarding the gun enhancement by the Third Circuit, to your

7  understanding, isn't that correct?

8  A.    That's correct.

9        MR. COGAN:  That's all I have, thank you.

10       THE COURT:  Mr. Piccinini.

11                  RECROSS-EXAMINATION

12  BY MR. PICCININI:

13  Q.   Counsel, with regard to summary remand, there seems to be

14  a question that indicated that the summary remand was to get

15  you back here to be able to argue the gun enhancement, as

16  opposed to a Booker issue.  I'm going to actually have you look
          ———————

17  at what has been entered into evidence as Defendant's Exhibit

18  D, which is the motion for summary remand.  I'm going to have

19  you look, first of all, at paragraphs one and two, where you

20  set forth the basis for the summary remand.  And would you

21  agree with me that in paragraph one you set forth that the

22  internal operating procedures and local appellate rules empower

23  this court to remand to the District Court for resentencing

24  when subsequent precedent warrants its action; do you agree it

25  says that?


34


1  A.   Yes.

2  Q.   And then in the second paragraph, is it true that you say

3  the "appellant avers and therefore believes that United_States
                                                     ——————— ———————

4  v._Booker, and United_States_v._Blakely, warrants remand by
   ——  ———————      ——————— ——————— ——— ————————

5   this court to the District Court for resentencing?"

6   A.   Yes.

7   Q.   Does it appear to you very clearly that the argument for

8   the summary remand was the new precedent under Booker and
                                                    ———————

9   Blakely, not the factual issue with regard to the gun
    ————————

10   enhancement?

11   A.   The Third Circuit did not want defense counsel to brief

12   the issue, it wanted it to file a motion for summary remand, so

13   that the case arguably could be sent back to the U.S. District

14   Court.

15   Q.   And with regard to your argument at the resentencing --

16   at the first sentencing, did you feel you were in any way in a

17   position, in light of there being a guideline of 135 to 160

18   months, to boldly come into court and say, judge, disregard the

19   guidelines at the first sentencing and just give her 120

20   months?

21   A.   Well --

22   Q.   In the first sentencing?

23   A.   At the first sentencing, I think the goal was actually,

24   obviously, you want to get it down to 120 months, which would

25    be the low end of the level 29.  So you argue that.  With the

35

1    fact that we believe that was appropriate.  We had filed

2    objections to the two-level increase and we believed that 108

3    to 135 guideline was appropriate.  And, obviously, we argued

4    for 120 months because that was the statutory mandatory

5    minimum.

6    Q.    In the resentencing didn't you recognize that everything

7    had changed from a sentencing guidelines standpoint, and that

8    regardless of what Judge McLaughlin found, you even say in the

9    transcript, judge, 120 months is good enough, whether it was

10    135 or 168 or a 108 to 135, you were now arguing that a

11    reasonable sentence of 120 months because the guidelines were

12    just advisory?

13    A.    The guidelines were advisory and we believed that was the

14    best outcome for the client.

15    Q.    I'm going to show you what I have marked as Government

16    Exhibit 3.  Government Exhibit 3 is the motion to vacate

17    sentence filed by Ms. Munnings at document 70 in the docket

18    here.  On page four of this particular document in all caps,

19  "Ms. Munnings avers that counsel did not, even with my specific

20  instruction to do so, file another direct appeal upon this

21  resentencing event to my dissatisfaction as was my right

22  post-August 12, 2005?"

23       MR. COGAN:  Your Honor, I'm going to object, that is

24  beyond the scope of my direct and redirect examinations.

25       THE COURT:  Overruled.  Go ahead.


                            36


1  BY MR. PICCININI:

2  Q.   As Ms. Munnings claims in this Habeas Corpus petition,

3  she says that you did not, even with her specific instruction

4  to do so, file another direct appeal upon the resentencing.

5  Counsel, is that true?

6  A.   That's not accurate.

7  Q.   She did not make any specific instruction for you to file

8  an appeal after the resentencing?

9  A.   No.

10  Q.   However, you did have and you do recall having specific

11  discussions with this client both just before the resentencing

12  and after the resentencing with regard to the goal of the

13  sentencing, getting it down to the lower guideline, and she was

14  satisfied with the job you did and with the sentence that was

15  received?

16  A.    Yes.

17  Q.    Did she in any way indicate to you, as you sat here in

18  the courtroom after the resentencing, any desire whatsoever to

19  appeal?

20  A.    No.  And just to reiterate.  One of the issues as related

21  to the two-level enhancement was the increased time, that was a

22  concern.  So when the court had reduced the time from 140 to

23  135 months, our discussion essentially centered around the fact

24  that this was a guideline sentence as if the gun enhancement

25  never applied.  And Ms. Munnings was satisfied with that


37


1  result.

2  Q.    And just seconds before having sitting down with your

3  client and having discussions, you recall from the transcript

4  and from your own recollection, Judge McLaughlin describing for

5  her her appellate rights and actually asking the government

6  whether or not this was a case where her appellate rights were

7   circumscribed by the plea letter?

8   A.   Yes.

9   Q.   And do you recall that since this plea was pre-Blakely, a
         _____

10  pre-Booker plea, the U.S. Attorney's Office in the Western
        _____

11  District didn't in any way require waivers of appellate rights?

12  A.   That's correct.  So the court had the knowledge there was

13  no waiver issue in the plea agreement.

14  Q.   Within seconds of Judge McLaughlin advising her of the

15  appeal rights is when you have the conversation about the

16  135-month sentence, and she expressed her satisfaction with the

17  sentence and her desire to go on with her life?

18  A.   Yes.

19       MR. PICCININI:  That's all I have, your Honor.

20       THE COURT:  Anything else, Mr. Cogan?

21       MR. COGAN:  No, your Honor.

22       THE COURT:  Thank you, Mr. Misko.  Any other

23  witnesses?

24       MR. COGAN:  Yes, your Honor, we would call Kelly

25  Munnings.

38

1          DEPUTY CLERK:  Please raise your right hand.

2      KELLY ELIZABETH MUNNINGS, PETITIONER HEREIN, SWORN

3               DIRECT EXAMINATION

4  BY MR. COGAN:

5  Q.    Could you state your name for the record, please?

6  A.    Kelly Elizabeth Munnings.

7  Q.    And you are in fact the Kelly Munnings who was sentenced

8  in this case previously, is that correct?

9  A.    Yes, I am.

10  Q.    And resentenced in this case as well, is that correct?

11  A.    Yes.

12  Q.    Now, I want to take you back to your original plea of

13  guilty.  Do you recall pleading guilty in this case in or

14  around August 25th of 2004?

15  A.    Yes.

16  Q.    Okay.  Prior to your plea of guilty, did you have any

17  discussions with Mr. Misko about this gun enhancement?

18  A.    Yes.

19  Q.    And what were those discussions?

20  A.    That the judge was going to probably put the two points

21  on and that --

22        THE COURT:  Keep your voice up, ma'am, please.

23        THE WITNESS:  I'm sorry.  That if the two-point

24  enhancement applied, we were going to file an appeal.

25  BY MR. COGAN:


                                    39


1  Q.    Maybe I should clarify, your Honor.  I'm talking about

2  prior to your plea of guilty in this case?

3  A.    Okay.

4  Q.    Prior to you pleading guilty and prior to a presentence

5  report being prepared, did you have any discussions prior to

6  your plea about this gun enhancement?

7  A.    No.

8  Q.    Okay.  Is it fair to say the first time that you knew

9  there was an issue with this gun enhancement occurred when you

10  received a copy of the presentence report while you were

11  incarcerated at the Erie County Jail in connection with this

12  case?

13  A.    No.

14  Q.    Okay.

15  A.    I'm sorry, would you repeat that.

16  Q.  Let me try to break it down a little bit.

17  A.  Yes.

18  Q.  When did you first learn, in connection with this

19  litigation, that the gun enhancement might be an issue?

20  A.  When I received the presentence report, yes.

21  Q.  And upon receiving the presentence report, did you

22  discuss this gun enhancement with Mr. Misko?

23  A.  No.  Did you say after or before?

24  Q.  No, after you received the presentence report?

25  A.  Yes.


40


1       THE COURT:  Hang on, ma'am, slow down a little bit,

2  okay.  Listen to what he's saying and then answer, but don't

3  talk over him.  Go ahead.

4  BY MR. COGAN:

5  Q.  Okay.  You received the presentence report, correct?

6  A.  Yes.

7  Q.  And noticed in there that there was an enhancement in

8  your sentencing range based upon possession of a firearm in

9  connection with the offense, is that correct?

10  A.   Yes, it is.

11  Q.   Did you then discuss your feelings about this enhancement

12  with Mr. Misko at some point?

13  A.   Yes.

14  Q.   And what did you tell him?

15  A.   That, to be honest, I didn't feel, I felt like since I

16  had made my plea, that they should have done something about

17  the gun enhancement sooner.  I just didn't like it, it wasn't

18  right.

19  Q.   Did you indicate to Mr. Misko your dissatisfaction with

20  the gun enhancement and how you felt and believed it was

21  inappropriate?

22  A.   Yes.

23  Q.   Okay.  Did your discussions then go to him filing

24  objections to that gun enhancement?

25  A.   Yes.


41


1  Q.   And to your understanding, he filed objections to that

2  gun enhancement and his objections to the presentence report,

3  and his supplemental objections to the presentence report,

4    which have already been admitted as exhibits in this hearing?

5    A.    Yes.

6    Q.    Now, did you then have, prior to sentencing but after

7    receipt of the presentence report, any further discussions with

8    Mr. Misko about what was going to happen at sentencing and what

9    was going to happen particularly with respect to the gun --

10   A.    Yes.

11   Q.    The gun enhancement?

12   A.    Yes.

13   Q.    Describe for the court what those discussions were?

14   A.    We spoke about it here at court, he told me that if the

15   judge multiplied the two-point enhancement, that he would file

16   an appeal according to Blakely.

                    _____

17   Q.    Was that your wish, was that your desire, that you in

18   connection with the appeal, to contest that gun enhancement?

19   A.    Yes.

20   Q.    Were the reasons behind it that you didn't believe it

21   should apply, in addition to thinking that you didn't want that

22   additional time attributed to you?

23   A.    Yes.

24   Q.    Okay.  Now, the court ultimately found that the gun

25  enhancement applied to your original sentencing, is that

42

1  correct?

2  A.   Yes.

3  Q.   Now, I've marked for the record Defendant's Exhibit C.

4  I'm going to show you what has been marked as Defendant's

5  Exhibit C, this is your amended judgment of conviction.  Did

6  you receive that document in conjunction with your sentencing?

7  A.   No, I didn't.

8  Q.   Mr. Misko did not provide it to you?

9  A.   No, I never received it.

10  Q.    But you understand that to be the judgment, the amended

11  judgment that was imposed, that included reference to the 2D1.1

12  enhancement, is that correct?

13  A.   Yes, this is the first judgment or the second judgment, I

14  never received either one.

15  Q.   Okay.  This was an amended judgment in connection with

16  your original sentencing, correct?

17  A.   Okay, yes.

18       THE COURT:  Even I'm confused.  I thought you were

19  calling the amended judgment the amended judgment that would

20  have reflected the resentencing -- did I do an amended judgment

21  on the original sentence as well?

22      MR. COGAN:  Yes, your Honor, I apologize for the

23  confusion.

24      THE COURT:  Then the record now reflects that.

25      MR. COGAN:  I apologize, your Honor, in my

43

1  questioning I overlooked that fact and I apologize to the

2  court.

3  BY MR. COGAN:

4  Q.   When did you first receive a copy of that document?

5  A.   A day last week.

6  Q.   When I sent it to you?

7  A.   Yes.

8      MR. COGAN:  All right.  Your Honor, I would move for

9  the admission of Defendant's Exhibit C.

10      THE COURT:  It's admitted.

11  BY MR. COGAN:

12  Q.   Now, per your previous discussions in conjunction with

13  your original sentencing with Mr. Misko, the discussions that

14  you had with him, you understood that he was going to file a

15  notice of appeal and appeal the gun enhancement, is that right?

16  A.   Yes.

17  Q.   Was that your understanding of what the issue was in your

18  appeal?

19  A.   Yes.

20  Q.   Your original appeal?

21  A.   Yes.

22  Q.   Okay.  And that was consistent with your direction to him

23  and your wishes, is that fair to say?

24  A.   Yes, that's fair to say.

25  Q.   Okay.  Now, in originally imposing the judgment of


44


1   sentence, the court made recommendations in the oral

2   pronouncement of sentence regarding placement in the drug

3   program, isn't that correct?

4   A.   Yes, it is.

5   Q.   And you recall those?

6   A.   Yes.

7   Q.   You thought you would be able to participate in the drug

8   program, isn't that correct?

9   A.   Yes.

10  Q.   Okay.  Now, when you left the United States Courthouse

11  after your original sentencing, you didn't go to a Federal

12  Bureau of Prisons' institution, isn't that correct?

13  A.   That's correct.

14  Q.   Where did you go?

15  A.   I went back to the Erie County Prison.  And on December

16  21st I was transport to the Crawford County Jail.

17  Q.   You essentially remained at the Crawford County Jail

18  because of your unresolved state charges for a pretty long

19  time, isn't that correct?

20  A.   Yes, sir.

21  Q.   Indeed, you never left the Crawford County Jail but to

22  come back here for resentencing, right?

23  A.   Yes.

24  Q.   Now, in the interim, you never had any discussions with

25  Mr. Misko, from the time you were sentenced until the time you

45

1  came back into this courthouse for resentencing regarding your

2  case, is that correct?

3  A.   That's correct.

4  Q.   And when you came to this courthouse, they actually

5  didn't bring you to the Erie County Jail to stay overnight,

6  they just brought you into the courthouse for your resentencing

7  and then took you back to Crawford County, right?

8  A.   That's correct.

9  Q.   Now, did you ever -- there's been the admission of

10  Defendant's Exhibit H, which has been previously marked and

11  admitted, I'd like to show you this.  This is the order from

12  the Third Circuit remanding your case.  Did you ever discuss

13  with Mr. Misko what this meant, what the Third Circuit did and

14  how it pertained to the gun enhancement and how it pertained

15  overall to your case?

16  A.   No.

17  Q.   Okay.  When you came back for resentencing, were you

18  really aware of what was going on with respect to the gun

19  enhancement?

20  A.   I had no idea.  When I was at Crawford County, I wrote --

21  I heard that Dan was coming back for resentencing.  I never

22   received anything except a copy of the initial appeal, whatever

23   he sent in.

24   Q.   The motion for remand that he sent in?

25   A.   Yes.  And so the day I got brought back here, I didn't


46


1   even know I was coming back here.  So I didn't know --

2   Q.   Did you have any thoughts whatsoever to why you were

3   coming back and what the Third Circuit had did to get you back

4   here, what was your understanding of how you won the appeal?

5   A.   My understanding was, because I listened to somebody

6   else, and my understanding was that I had an opportunity to get

7   half my sentence taken off because of Blakely.  But other than

   _____

8   that, I was clue less, I didn't have any idea.

9   Q.   Did you know that the Third Circuit did not act to remove

10   the gun enhancement in any fashion?

11   A.   No.

12   Q.   Okay.  Now, you were sentenced -- excuse me for one

13   second, your Honor, I apologize.  You were sentenced by this

14   judge to a reduced term of 135 months incarceration, is that

15   correct?

16  A.   Yes, correct.

17  Q.   Did you discuss with Mr. Misko an appeal of that new

18  sentence?

19  A.   After my resentence, we sat at the table and I said can

20  we appeal this.  That's all I asked, can we appeal this.  And

21  he explained to me that the judge stayed at the high end of the

22  108 to 135 range and it didn't give me any room to appeal.

23  Q.   From your discussions with Mr. Misko, was it your

24  understanding that you could not appeal the amended judgment of

25  sentence, the reduced 135-month sentence?


                                    47


1  A.   An accurate understanding would be that I didn't have any

2  grounds for appeal, none.  And as far as I was concerned, I

3  didn't think I had the gun enhancement anymore.  I didn't know

4  it was on there until my case manager told me at my first team

5  meeting at the prison.

6  Q.   Okay.  And we'll get to that.  As best you can recall

7  those discussions that you had with Mr. Misko, did he explain

8  to you or did you understand that you could continue to

9  challenge that gun enhancement?

10   A.   No, I didn't.

11   Q.   And that was because of why?

12   A.   Because he basically said that the judge stayed in the

13   high end, I didn't have any grounds to appeal anymore.  And I

14   trusted him.  I told him I trust you and I do, I trust you for

15   that and I thank you, you did a good job.

16   Q.   Were you aware, in connection with the imposition of

17   sentence, that you could challenge the reasonableness of the

18   application of the sentencing factors pursuant to the

19   sentencing statute, Title 18, United States Code, Section 3553

20   in a second appeal?

21   A.   No, I wasn't aware.

22   Q.   Were you aware, in connection with that resentencing,

23   that there was a gun enhancement still applied to you?

24   A.   No, I wasn't aware.

25   Q.   So you weren't then aware, I take it, that that gun


48


1   enhancement would prejudice your ability to enter into the drug

2   abuse treatment program, such that you could receive a

3   reduction in sentence?

4    A.    No, I was not aware, no.

5          MR. COGAN:  Your Honor, I have marked this as

6    Defendant's Exhibit E.  And Defendant's Exhibit E is a fairly

7    lengthy document, your Honor.  It is a document that I

8    downloaded from the Bureau of Prisons' Web site, basically it's

9    all of their policy statements.  I have here a copy for the

10   court, if the court would like to see it.  And I have a copy

11   for Ms. Munnings.

12   BY MR. COGAN:

13   Q.    Ms. Munnings, I'm referring to the place that I have

14   tabbed, Chapter 6 -- are you generally aware of that policy

15   that is elaborated on on that page that I have tabbed?

16          THE COURT:  Do you mean early release

17   qualifications?

18          MR. COGAN:  Yes, your Honor.

19   BY MR. COGAN:

20   Q.    Particularly Section 6 at the bottom, Section 6(b).  Is

21   it your understanding that that particular policy statement is

22   what is excluding you, because of the gun enhancement, from the

23   early release program?

24   A.    Yes, it is.

25        MR. COGAN:  Your Honor, I would move for the

                                    49

1    admission of Defendant's Exhibit E.

2          THE COURT:  It's admitted.

3    BY MR. COGAN:

4    Q.    Now, from the time that you were resentenced, you still

5    then didn't go back to or you didn't go then to a Federal

6    Bureau of Prisons' institution, is that correct?

7    A.    That's correct.

8    Q.    When did you first arrive at a Federal Bureau of Prisons'

9    institution?

10    A.    January 26th.

11    Q.    That's 2006?

12    A.    2006.

13    Q.    What happened when you first arrived at -- was it FCI

14    Alderson?

15    A.    Yes.

16    Q.    What happened when you arrived at FCI Alderson?

17    A.    Well, you're in a two-week orientation.  And then within

18    the first six weeks you're seen by a team.  The team is your

19  unit manager, case manager and counselor.  And that's when they

20  review your case and let you know what you're eligible for and

21  what you're not.

22  Q.    Now, did you learn from this counselor that the gun

23  enhancement had been applied by the judge and that you were

24  ineligible for participation in the early release program

25  because of that gun enhancement?


50


1  A.    Yes, it was my case manager, Ms. Evans.

2  Q.    What particularly did she tell you?

3  A.    She told me that as she was going through the paperwork,

4  she said you have a gun enhancement here, you know that makes

5  you ineligible.  I said no, I don't have a gun enhancement,

6  that has to be a mistake.  I had a resentence and it was taken

7  off.  And she said well, I don't have that here.  We left it at

8  that for now, I told her I had to get a hold of my attorney.

9  Q.    Okay.  Now, was it because of your discussions with Mr.

10  Misko following your resentencing that you believed that the

11  gun enhancement did not apply to you?

12  A.    Yes.

13  Q.    Now, since I have become your attorney, I have forwarded

14  to you various items from your file, isn't that correct?

15  A.    Yes, it is.

16  Q.    One of those documents I forwarded to you was the

17  resentencing transcript?

18  A.    Yes.

19  Q.    Now, you have had a chance to review that transcript?

20  A.    Yes.

21  Q.    You understand that the judge applied the gun enhancement

22  in resentencing, isn't that correct?

23  A.    That is correct.

24  Q.    But this did not come across to you at the time that you

25  were resentenced?

51

1  A.    No.

2  Q.    Okay.  Could you just elaborate for the court because I'm

3  sure the court is curious as to how that could have happened?

4  A.    Of what?

5  Q.    Of how you came to believe that you did not get the gun

6  enhancement?

7  A.    After reading the transcript that you sent me, I could

8  see right where the judge said it applied, but I don't recall.

9  I know he said it, I don't recall hearing it.  But it didn't

10  phase me.  But after the hearing was over, the way that the

11  sentence -- the way that Mr. Misko told me that he stayed at

12  the maximum of the guideline range at 135, made me believe that

13  he lowered me out of the higher range to the lower range.  And

14  I have swore by it, it was excited, I went back telling people

15  I got my gun enhancement dropped and I was wrong.

16  Q.    I'd like to show you what's previously been marked as

17  Defendant's Exhibit F, this is a copy of the amended judgment.

18  Does the amended judgment reference anything regarding the gun

19  enhancement particularly?

20  A.    Not that I can see.

21         MR. COGAN:  I would move for the admission of

22  Defendant's Exhibit F.

23         THE COURT:  It's admitted.

24  BY MR. COGAN:

25  Q.    Ms. Munnings, I only have a few more questions for you.

52

1   Mr. Piccinini discussed a little bit with your previous

2   attorney in the filing of the 2255 petition.  How did you come

3   to file that 2255 petition -- the petition for Habeas Corpus,

4   was that something that you initially created yourself or was

5   this the product of someone else?

6   A.   It was the product of someone else.

7   Q.   Could you explain for the court how that came to occur?

8   A.   I received a copy in the mail from my co-defendant --

9        THE COURT:  A copy of what?

10       THE WITNESS:  Of the motion for the 2255.

11  BY MR. COGAN:

12  Q.   Was that a copy of his motion or a copy for you?

13  A.   It was an identical copy to his motion.

14  Q.   Okay.  And was that the result of your discussions with

15  him that you had, upon which you discovered that the gun

16  enhancement applied?

17  A.   Yes.

18  Q.   Can you just explain that for the court, how that came

19  about, how you came to want to file a 2255 petition?

20  A.   Well, because I don't know how to answer that -- well,

21  because I wanted to get the gun enhancement taken off so I

22  could take the drug program eventually, that was important to

23  me.

24  Q.    You had discussions with your co-defendant, Mr. Hines, to

25  that effect, and as a result he forwarded to you what he found,


53


1  is that fair to say?

2  A.    That's fair to say -- I didn't understand.

3  Q.    I apologize.  So, just to reiterate, I apologize if I'm

4  leading a little bit.  You had in your mind this realization

5  that the gun enhancement applied, is that correct?

6  A.    Yes.

7  Q.    And you talked to your co-defendant, Mr. Hines, regarding

8  the gun enhancement, in some form you communicated with him?

9  A.    Yes.

10  Q.    Okay.  And he suggested that you challenge it by way of a

11  2255?

12  A.    Yes.

13  Q.    And he forwarded to you either what he filed or what he

14  prepared for you to file?

15  A.    Correct.

16  Q.    And you filed it?

17   A.   Yes.

18   Q.   Now, if you were aware at the time of your resentencing

19   that the gun enhancement was applied by the court, if that what

20   was in your mind, it was in your heart, would you then have

21   instructed Mr. Misko to file an appeal on your behalf after

22   your resentencing?

23   A.   Yes, I believe I would.

24   Q.   If you knew that you could have received potentially a

25   lower sentence if the gun enhancement were removed from the


                                    54


1   sentence of 135 months the court imposed, would you have wanted

2   him to appeal to try to pursue that remedy?

3   A.   Yes, I would like to try to get down to 120 months.

4   Q.   Mr. Misko explained to you the disadvantage of an appeal,

5   that there was nothing that could be gained from an appeal, is

6   that correct?

7   A.   That's what he said.

8   Q.   Did he explain to you any advantages that could be

9   gained?

10  A.   No, I don't recall.

11  Q.    Did he tell you, I take it that he did not, but just for

12  the record, he didn't tell you that you would be eligible for

13  the drug program because of the gun enhancement, if you filed

14  an appeal and were successful, that you would be eligible for a

15  reduction in your sentence because of participation in the drug

16  program, is that correct?

17  A.    What's correct is we didn't talk about that, because I

18  didn't even know I was eligible until they told me at my team

19  meeting.

20  Q.    And just to clarify one point.  You are participating in

21  the drug program for treatment, but you can't earn early

22  release because of the gun enhancement, is that correct?

23  A.    Yes, that's correct.

24         MR. COGAN:  That's all I have, your Honor.

25         THE COURT:  All right, Mr. Piccinini.


55


1              CROSS-EXAMINATION

2  BY MR. PICCININI:

3  Q.    Ma'am, you're indicating that you didn't know about the

4  drug enhancement, excuse me, the gun enhancement's effect on

5  the drug program until 2006, is that correct?

6  A.   Until I got to the prison, yes, sir.

7  Q.   You would agree with me that the reason why you wanted an

8  appeal to be filed on your behalf is to be able to remove the

9  gun enhancement?

10  A.   Yes.

11  Q.   The reason why you want that to happen is so that you can

12  benefit from I believe the 12-month reduction in your sentence,

13  is that correct?

14  A.   Yes.

15  Q.   You would agree with me that it was only after the

16  resentencing, when you made it to a federal prison, that you

17  learned that you couldn't get that drug benefit if you had the

18  gun enhancement?

19  A.   Yes, sir.

20  Q.   So that after your first sentencing, you went off and

21  served sentences in other places.  After the first sentencing

22  and before the resentencing, you didn't know anything about the

23  loss of the drug program benefit, you didn't know anything

24  about it after the first sentencing?

25  A.   No, I didn't know anything about it yet.

1  Q.   After the day of resentencing, you still didn't know

2  anything about it at that point in time?

3  A.   No, I didn't.

4  Q.   It was only sometime after the resentencing, when you get

5  to a federal prison and you talk to the counselors, like you

6  testified to, you find out about the impact of the drug

7  program?

8  A.   That's correct.

9  Q.   And you would agree with me, again, that the reason for

10  your appeal of the gun enhancement is because you wanted the

11  benefit, I think it's 12 months being taken off, is that

12  correct?

13  A.   That's correct.

14  Q.   So you would agree with me that as of the date of your

15  resentencing, which occurred on August of 4th, I believe, of

16  2005, you did not --

17       THE COURT:  August 2nd.

18  BY MR. PICCININI:

19  Q.   August 2nd of 2005, you did not have discussions with

20  Attorney Misko that day about the drug program because you

21  didn't know anything about the drug program?

22  A.    That's correct.

23  Q.    In fact, at the end of the sentencing in your meeting

24  with Mr. Misko, you testified that you thanked Mr. Misko for

25  his help?

57

1  A.    Yes, I did.

2  Q.    In fact, at some point in time, didn't you thank him for

3  having filed whatever paperwork was filed on your behalf to get

4  back here for the resentencing?

5  A.    Yes, I did.

6  Q.    And understanding that you had a 135-month sentence, five

7  months reduced, don't you recall saying words to the effect to

8  Mr. Misko, that you really just wanted to get on with your

9  life, get treatment or whatever it was?

10  A.    To be quite honest with you, I don't exactly remember the

11  words I used.  Because I can honestly say I wasn't happy about,

12  I'm very satisfied that I had some time taken off.  But I had

13  my hopes too high, because I listened to other people and I

14  shouldn't have done that.  But I still wanted to take the drug

15  program.  But I didn't know that I could get time taken off

16  with the gun enhancement.

17  Q.    Because at that point in time, again, the resentencing,

18  the impact of the gun enhancement on the drug program was not

19  something you even knew anything about?

20  A.    That's correct, I didn't know anything about it.

21  Q.    In your discussions with Mr. Misko, just before the

22  resentencing and after the resentencing, isn't it true that you

23  and he talked about the 135 months?

24  A.    After, yes.

25  Q.    And that 135 months was a sentence that applied in either


58


1  guideline, the lower one or the top one, 135 was in both of

2  them?

3  A.    I understand that it was.  But our discussion was clearly

4  that it was the high end of the lower guideline.

5  Q.    But that they overlapped, it was the high end of the

6  lower guideline and it was the low end of the higher guideline,

7  the two sentences overlapped?

8  A.   I know that now, but at that time we didn't even think

9  about the high -- didn't even come with the higher guideline.

10  Q.   Of the higher guideline?

11  A.   I mean of the next set of guidelines.  We talked about --

12  my exact words were can we appeal this again.  And he said the

13  judge stayed at a safe spot, because he's at the high end of

14  the guideline, so it doesn't give you any room to appeal.

15  Q.   You agreed, you would agree with me, you did not ask Mr.

16  Misko to file an appeal?

17  A.   To be accurate, I didn't demand him to, I asked him can

18  we appeal this.  That's all I said.

19  Q.   With regard to the content of your Habeas Corpus

20  petition, wherein it says that counsel did not, even with my

21  specific instruction to do so, file another direct appeal, this

22  is Government Exhibit 3 for identification.  You'd agree with

23  me that you never even wrote those words?

24  A.   No, I didn't, sir.  I understand what it says.  I didn't

25  directly demand that he do it.  I didn't, no.


59


1  Q.   So if I show you Government Exhibit 3 for identification,

2  where it says this in bold letters, you see it's on there --

3  even though you signed this document where it says "I declare

4  under penalty of perjury that the foregoing is true and

5  correct," you executed this on July 14, 2006, you never

6  directly told Mr. Misko to file an appeal?

7  A.   Yes -- well, I wouldn't directly say it because it's not

8  in my nature to say it that way.  But we did talk about an

9  appeal, I said can we appeal this.  I was adamant about

10  appealing to get more time off.  But it was my understanding

11  that the guns were off already, I still wanted to get more.

12  The reason being is because somebody told me to always appeal

13  it no matter what.  So I just asked him can we appeal.

14  Q.   Someone in jail --

15  A.   I didn't say appeal this, you know.

16  Q.   You remained in contact with your co-defendant, Mr.

17  Hines, is that correct?

18  A.   Through correspondence.

19  Q.   Okay.  I'm going to show you what I have marked as

20  Government Exhibit 4 for identification.  And this, of course,

21  would be Mr. Hines' motion to vacate the sentence, okay.  And

22  this is Government Exhibit 3, your motion to vacate the

23  sentence?

24   A.   Uh-huh.

25   Q.   As you go through these two documents, would it surprise

60

1   you to know that in a lot of respects, even the typos and the

2   marks that are on the pages, that they're both the same

3   document, just the names have been changed?

4   A.   Yes, I am aware of that, yes.

5   Q.   Prior to the filing of these petitions, Mr. Hines is on

6   one date and yours a week or so later, is it accurate to say

7   that you never told Mr. Hines that you had asked Mr. Misko to

8   file an appeal on your behalf, did you?

9   A.   He knows I asked him to.

10   Q.   But you just testified you didn't ask him to, you say you

11   asked him whether an appeal would be appropriate?

12   A.   I said can we appeal this.  I'm being honest, I don't

13   know about the legal terms and all that.

14   Q.   But how would Mr. Hines have any idea about that

15   conversation?

16   A.   Well, we wrote each other.

17   Q.   At some point in time didn't you both write to one

18  another when you came to the realization, long after the

19  resentencing, about the impact the gun enhancement had on the

20  drug program?

21  A.   Once I was already at the prison, yes.

22  Q.   I'm sorry when was that?

23  A.   After January 26th of 2006.

24  Q.   So you're sentenced in August of '05, it's only after

25  January of '06 that you come to that realization?


                                61


1  A.   Yes, after that, like February, six weeks after I got

2  there.

3  Q.   When you met with the counselor?

4  A.   Yes.

5  Q.   In addition, Mr. Hines, it was a revelation to him, that

6  the gun enhancement affected the drug program benefit?

7        MR. COGAN:  Your Honor, I'm going to object, I don't

8  know that she would have any knowledge to testify about what

9  Mr. Hines knew.

10        THE COURT:  Unless Mr. Hines told her that.

11  BY MR. PICCININI:

12  Q.    You said that you guys talked?

13  A.    Mr. Hines was sure that the gun enhancement was still on.

14  I was sure that my gun enhancement was off.  And I even had an

15  argument with his mom about it.

16  Q.    My question is, isn't it true that only in 2006 did you

17  and Mr. Hines come to the realization in your discussions, that

18  you couldn't get the benefit of the drug program?

19  A.    I think that -- I know that I can't get the benefit, but

20  I'm not sure, I don't think he can even take the drug program.

21  I'm not sure or positive.

22        THE COURT:  I don't care what he can get.

23  BY MR. PICCININI:

24  Q.    But my question is, isn't it true there was no knowledge

25  about the gun, the effect that the gun enhancement had in any

62

1  way on the drug program until 2006?

2  A.    Yes, after I got to the prison.

3  Q.    But what's important to you on appeal is the impact of

4  that drug program would have on your sentence.  If you can get

5  rid of the gun enhancement and you get the drug program, you

6  can reduce it by about 12 months?

7  A.   If I could get some time off, it would be helpful.

8       MR. PICCININI:  Okay, thank you.

9       THE COURT:  Anything else, Mr. Cogan?

10      MR. COGAN:  Very briefly.

11              REDIRECT EXAMINATION

12  BY MR. COGAN:

13  Q.   Now, Ms. Munnings, you had talked with Attorney Misko

14  about the drug program in conjunction with your case originally

15  before you were even sentenced, isn't that correct?

16  A.   Before my original sentence?

17  Q.   Yes.

18  A.   Yes, that I wanted to take the drug program.

19  Q.   He told you that there was a drug program by which you

20  could earn time off by the Bureau of Prisons?

21  A.   Yes, we calculated how much time I would get off.

22  Q.   What you were talking about was you didn't learn until

23  you actually arrived at the Bureau of Prisons that you would

24  not be ineligible for that program because of the gun

25  enhancement?

1   A.   Correct.

2   Q.   Just one final question.  Could you describe for the

3   court what discussions you had with a person in the holding

4   cell prior to your resentencing that occasioned you to even

5   more particularly want to appeal?

6   A.   When I was coming around by the holding cells right

7   outside the door.

8   Q.   This was prior to your resentencing, immediately prior?

9   A.   Immediately prior, Danny had already been resentenced.

10  Q.   What happened?

11  A.   There was a fellow in there with Danny and he said always

12  appeal no matter what, always keep appealing.  He must have

13  been back on an appeal.

14  Q.   And that was in your mind when you had the discussions

15  with Mr. Misko?

16  A.   I have to say I don't know a lot about this legal stuff,

17  so I wouldn't have known to keep saying appeal.  Because I feel

18  I did the crime, I felt that the judge gave me a fair sentence.

19  But I didn't know my legal -- that I could keep appealing, no,

20  I didn't know that.  But he told me to keep appealing it,

21  that's all he said.

22          MR. COGAN:  Okay, thank you.

23          THE COURT:  I'm confused, Ms. Munnings, who drafted,

24  physically drafted your 2255 petition?

25          THE WITNESS:  Mr. Hines.


                            64


1          THE COURT:  In its entirety?

2          THE WITNESS:  Yes, sir.

3          THE COURT:  And you signed it?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Did you read it?

6          THE WITNESS:  Yes, I did, three times, four times, I

7  didn't understand it, though.

8          THE COURT:  Did you read it before you signed it?

9          THE WITNESS:  Yes, I did.

10          THE COURT:  All right, thank you, you can step down.

11          THE WITNESS:  Thank you.

12          MR. PICCININI:  Your Honor, request the admission

13  into evidence of Government's Exhibits 3 and 4.

14          MR. COGAN:  No objection.

15          THE COURT:  They're admitted.

16          MR. COGAN:  Your Honor, because of the lateness in

17   the day --

18          THE COURT:  I'm going to remedy that.  You have 20

19   days after the receipt of the transcript in this case --

20   within 20 days after the receipt of the transcript, the

21   petitioner will file a post-hearing brief.  To be precise, it

22   will be a post-hearing brief with the petitioner's proposed

23   findings of fact and conclusions of law.  Then 20 days after

24   receipt of the petitioner's brief, the government will file a

25   response in the nature of the government's proposed findings of


                              65


1    fact and conclusions of law.  I'll then get out a written

2    opinion on it.  All right, thank you, counsel.

3

4          (Whereupon, at 5:00 p.m., the proceedings were

5    concluded.)

6

7                    - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

66

1                    C E R T I F I C A T E

2

3

4

5     I, Ronald J. Bench, certify that the foregoing is a

6  correct transcript from the record of proceedings in the

7  above-entitled matter.

8

9

10

11

12  _____

13  Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25